# EXHIBIT

# A

Electronically Filed by Superior Court of California, County of Orange, 05/10/2021 01:50:16 PM.
30-2021-01200562-CU-BT-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Skeeter Berry, Deputy Clerk.
Case 8:22-cv-01075-DOC-DFM Document 1-1 Filed 06/13/22 Page 2 of 20 Page ID #:6

**MAYER BROWN LLP**
Keri E. Borders (SBN 194015)
*kborders@mayerbrown.com*
Dale J. Giali (SBN 150382)
*dgiali@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Plaintiff DALE J. GIALI

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| DALE J. GIALI, an individual,<br><br>                    Plaintiff,<br><br>            vs.<br><br>ULRS, INC. dba UNITED LEGAL GROUP;<br>TITANIUM ALARM, LLC, and DOES 1<br>through 10,<br><br>                    Defendants. | Case No. 30-2021-01200562-CU-BT-CJC<br><br>**COMPLAINT FOR ACTUAL DAMAGES, STATUTORY DAMAGES, INJUNCTIVE RELIEF, AND ATTORNEYS' FEES AND LITIGATION COSTS FOR:**<br><br>**1. VIOLATION OF THE FAIR DEBT COLLECTION ACT;**<br><br>**2. VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT;**<br><br>**3. VIOLATION OF THE FAIR CREDIT REPORTING ACT;**<br><br>**4. VIOALTION OF THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT, and**<br><br>**5. DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Assigned for All Purposes**<br>Judge Deborah Servino |

741514878.1

COMPLAINT, CASE NO. _____

1    Plaintiff Dale J. Giali, through this complaint, complains and alleges as follows against

2  defendant ULRS, Inc. dba United Legal Group ( "United Legal"), Titanium Alarm, LLC

3  ("Titanium") (collectively "United Legal" and "Titanium" are referred to as "Defendants"), and

4  DOES 1 through 10, inclusive:

5                              **INTRODUCTION**

6    1.    This complaint details an all-too-familiar scenario of strong-arm tactics and sharp

7  practices by unscrupulous businesses against a consumer accompanied by demands for money.

8  The amount of the money demands are too small for the average consumer to justify hiring a

9  lawyer, and the threats of action from the unscrupulous businesses are too significant for the

10  consumer to just ignore.

11    2.    Faced with these actions, many consumers just give-in and pay the money. This

12  time, however, the unscrupulous businesses targeted a consumer with the ability to protect his

13  rights.

14    3.    This consumer is protecting his rights by suing the unscrupulous businesses.

15  United Legal is being used under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.

16  ("FDCPA") and the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, et seq.

17  ("RFDCPA"), both of which prohibit debt collectors from engaging in abusive, deceptive, and

18  unfair practices, as well as under the Fair Credit Reporting Act, 15 U.S.C. § 1681 ("FCRA") and

19  the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785.25 ("CCRAA"),

20  both of which regulate the collection, dissemination, and use of consumer information, including

21  consumer credit information. Titanium is being sued for declaratory relief.

22    4.    At all relevant times, the conduct of Defendants, acting by and through their

23  agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly

24  negligent disregard for plaintiff's rights, and federal and state laws.

25                              **PARTIES**

26    5.    At all relevant times, plaintiff Dale Giali, a natural person residing in Orange

27  County, was a consumer and/or debtor as defined by FDCPA, FCRA and RFDCPA.

28    6.    At all relevant times, defendant United Legal was a company with its principal

COMPLAINT, CASE NO. _____

place of business in Corona, California and doing business in Orange County, California. At all relevant times, defendant United Legal was engaged, by use of the mails and telephone, in the business of collecting from consumers, including plaintiff, a purported debt as defined by FDCPA and a purported consumer debt as defined by RFDCPA. At all relevant times, United Legal regularly attempts to collect debts alleged to be due another, and therefore, is a debt collector as defined by FDCPA and RFDCPA. At all relevant times, United Legal also regularly provides information to consumer reporting agencies and is therefore an information furnisher as defined by FCRA and CCRAA. At all relevant times, United Legal was a person as that term is defined by FCRA. At all relevant times, United Legal was acting by and through its agents, servants, contractors, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of United Legal.

7.     At all relevant times, defendant Titanium was a company with its principal place of business in Rancho Cucamonga, California and doing business in Orange County, California. At all relevant times, Titanium was in the home security business, including installing and monitoring home alarm and video systems. At all relevant times, Titanium was acting by and through its agents, servants, contractors and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Titanium.

## DOE DEFENDANTS

8.     The true names and capacities, whether individual or otherwise, of DOES 1 through 10, inclusive, are unknown to plaintiff who therefore sues them by such fictitious names. Though the full extent of the facts linking such fictitiously sued defendants is unknown to plaintiff, plaintiff is informed and believes, and therefore alleges, that each engaged in misconduct and legally and proximately caused the damages alleged herein. Plaintiff will hereafter seek leave of Court to amend this complaint to state the DOE defendants' true names and capacities once ascertained.

## JURISDICTION

9.     This Court has jurisdiction and venue over this matter because plaintiff resides in this county, the unlawful conduct was conceived of and/or carried out in this county, and plaintiff

COMPLAINT, CASE NO. _____

1   is seeking injunctive relief, and is also seeking statutory and actual damages, and prevailing party

2   attorneys' fees and costs pursuant to statute, all of which is in excess of $25,000.

3   <center>**SPECIFIC ALLEGATIONS**</center>

4       10.     As detailed below, at various multiple times prior to initiating this lawsuit,

5   including within one year preceding the filing of this complaint, United Legal contacted plaintiff

6   in an attempt to collect an alleged outstanding debt.

7       11.     Furthermore, prior to initiating this lawsuit, including within one year preceding

8   the filing of this complaint, United Legal reported to plaintiff that United Legal reported

9   derogatory credit information regarding plaintiff to credit reporting agencies.

10      12.     Plaintiff does not owe the debt that United Legal and Titanium allege plaintiff

11  owes, and plaintiff repeatedly communicated that fact to United Legal and to Titanium.

12      13.     United Legal's conduct as detailed below violated, among other laws, the FDCPA

13  and RFDCPA in multiple ways, including, without limitation:

14          a.  Falsely representing the character, amount or legal status of plaintiff's

15              alleged debt;

16          b.  Communicating or threatening to communicate credit information that is

17              known or should be known to be false;

18          c.  Using false representations and deceptive and abusive practices in

19              connection with collection of an alleged debt from plaintiff;

20          d.  Failing to verify the debt after plaintiff disputed the debt; and

21          e.  Failing to maintain systems sufficient to avoid these errors.

22      14.     As detailed below, Titanium knowingly wrongfully claimed to be under contract

23  with plaintiff for monitoring plaintiff's home alarm, and knowingly wrongfully claimed that

24  plaintiff failed to pay for, and was in debt for, monitoring services.

25      15.     Defendants' conduct was a direct and proximate cause, as well as a substantial

26  factor, in causing the injuries, damages and harm detailed in this complaint. United Legal is liable

27  to compensate plaintiff for actual and statutory damages, along with attorneys' fees and costs, as

28  well as such other relief permitted by law.

16.     Plaintiff has been damaged, and continues to be damaged, in at least the following ways, among others:

        a.  Emotional distress, personal humiliation and mental anguish associated with having incorrect derogatory personal information said and transmitted about plaintiff to other people both known and unknown;

        b.  Out of pocket expenses associated with disputing the information and false allegations against plaintiff; and

        c.  Attorney time and litigation costs associated with developing, bringing and litigating this lawsuit.

17.     In or about April 2014, plaintiff purchased a new home in Orange County. The home was wired for a home alarm system, but the home needed various hardware for the alarm system to operate and, once installed, plaintiff intended to have the alarm system professionally monitored.

18.     On April 17, 2014, plaintiff obtained a proposal for the hardware, installation and monitoring from Nationwide Security Alarms Inc., dba NSA Systems. On April 21, 2014, based on the proposal, plaintiff entered into a written agreement with NSA Systems for the installation of the necessary hardware and to monitor the alarm system. Under the agreement, plaintiff was to pay NSA Systems the amount of $44.99 per month for five years.

19.     Significantly, though NSA Systems appears to claim the right under the agreement to assign the *monthly payments* to another, *NSA Systems had no right to assign the monitoring services to another*. Per the written agreement, monitoring services were to be performed by NSA Systems. No right to assign the actual monitoring services makes a lot of sense. When a consumer contracts with an alarm monitoring company, the issue of who provides those services and how they are provided are very important to the consumer and not for unilateral assignment by the monitoring company.

20.     Shortly after the installation and monitoring agreement with NSA Systems was signed, plaintiff was informed that plaintiff was to make the monthly payments to a Massachusetts company called TimePayment Corp. Plaintiff timely made monthly payments to

- 4 -

COMPLAINT, CASE NO. _____

1    TimePayment.

2           21.    Sometime in 2018, NSA Systems liquidated, ceased operating and stopped

3    provided monitoring services to plaintiff. Plaintiff has no present recollection of being informed

4    of NSA Systems' demise, though at some point in 2018, and unbeknownst to plaintiff, NSA

5    Systems' monitoring of plaintiff's home alarm stopped.

6           22.    In or about August 2018, apparently following NSA Systems' demise,

7    TimePayment purportedly sold plaintiff's account to Titanium and Titanium was now purportedly

8    to fulfill the monitoring services for the alarm system at plaintiff's home and was purportedly

9    entitled to a monthly payment for the services.

10          23.    Plaintiff understands that the alarm system as installed and set up for operation in

11   plaintiff's home by NSA Systems used a COPS signal, but plaintiff understands that Titanium

12   uses an AvantGuard signal.

13          24.    Significantly, plaintiff has no present recollection of being informed of any

14   transaction wherein Titanium was taking over the monitoring services or that plaintiff was now to

15   be receiving services from an entirely different alarm monitoring company.

16          25.    Even more important, at no time did plaintiff agree to having Titanium provide

17   alarm monitoring services. Plaintiff is unaware of ever being under contact with Titanium, such

18   that Titanium had any rights to provide plaintiff's monitoring services. Moreover, plaintiff is

19   unaware of Titanium ever having been at plaintiff's home, accessing plaintiff's alarm system or

20   setting up plaintiff's alarm system to use an AvantGuard signal.

21          26.    In or about August 2018, and without plaintiff's knowledge or agreement, the

22   entirety of the remaining balance on plaintiff's 5-year contract with NSA Systems was allegedly

23   paid to TimePayment, perhaps by Titanium, and TimePayment closed-out its records on

24   plaintiff's account.

25          27.    Subsequent to August 2018, plaintiff began to experience issues with monitoring

26   his alarm system. False alarms were being triggered, but there was no response from the

27   monitoring service (i.e., no check-in calls to inquire about the triggered alarm), or an entirely

28   insufficient response, from the monitoring agency. Unbeknownst to plaintiff, the monitoring

1   agency was no longer NSA Systems. Plaintiff was eventually able to identify and get ahold of

2   Titanium. Very quickly thereafter – based on, among other things, telephone conferences with

3   Titanium – plaintiff reached the conclusion that Titanium was entirely incapable of providing

4   appropriate home alarm monitoring services to plaintiff.

5        28.    On October 17, 2018, still unaware of the circumstances of NSA Systems' demise

6   and what Titanium's role was and how Titanium was placed in that role, plaintiff cancelled

7   Titanium's services via Titanium's preferred cancellation method, which was an e-mail to

8   cancellation@titaniumllc.com.

9        29.    On October 17, 2018, the same day that plaintiff cancelled Titanium, plaintiff

10   received a confirming e-mail from Titanium's Cancellation Department, confirming receipt of the

11   cancellation.

12       30.    At some point subsequent to October 17, 2018, Titanium reached out to plaintiff to

13   try to coax plaintiff into giving Titanium a chance to demonstrate its alarm monitoring

14   competency and to save the account. As part of that coaxing, Titanium scheduled a service

15   appointment for November 7, 2018 to visit plaintiff's home and look at plaintiff's alarm system.

16       31.    On November 1, 2018, plaintiff again experienced a false alarm without

17   appropriate monitoring from Titanium.

18       32.    On November 2, 2018, plaintiff called Titanium to report the November 1 problem

19   and the fact that there was an entirely insufficient monitoring of the alarm system. Titanium had

20   no explanation for the problems. During that telephone call, plaintiff also cancelled the

21   November 7, 2018 service appointment because plaintiff realized that he was having flooring re-

22   done at his home that day and it was no longer a good day to have another vendor at plaintiff's

23   home. The Titanium representative said that the appointment cancellation was not a problem and

24   that the service appointment could be rescheduled. During the call, the Titanium service

25   representative confirmed that the November 7 service appointment was cancelled.

26       33.    Nevertheless, on November 7, 2018, with plaintiff not at home and while flooring

27   contractors were working at plaintiff's home, a Titanium representative showed up at plaintiff's

28   home for the cancelled service appointment, apparently having received no notice that it was

1    cancelled.

2        34.    On November 7, 2018, having now experienced multiple instances of complete

3    incompetence and having zero confidence in Titanium's ability to fulfil the important job of

4    monitoring plaintiff's home security, plaintiff again e-mailed Titanium to confirm cancellation of

5    Titanium's services. As with the first cancellation notice, plaintiff received an e-mail from

6    Titanium's Cancellation Department on the same day confirming plaintiff's cancellation.

7        35.    Plaintiff went several months without any alarm monitoring service, but on April

8    4, 2019, plaintiff communicated with a new alarm company, Caliber Security, resulting in

9    plaintiff entering into a contract with Caliber Security to have it monitor's plaintiff's home alarm.

10   Plaintiff has been under contract for alarm monitoring with Caliber Security since that time.

11       36.    On December 7, 2019, plaintiff received a telephone call from a Titanium

12   representative who said that plaintiff owed Titanium **$522.40**. Plaintiff informed the Titanium

13   representative that – assuming that there ever was a relationship between plaintiff and Titanium –

14   plaintiff had terminated Titanium more than a year prior due to incompetence and a total loss of

15   confidence.

16       37.    Incredibly, the Titanium representative said that Titanium *had no record*

17   *whatsoever of any prior cancellation*. Moreover, the Titanium representative said she would *not*

18   be able to confirm any prior cancellation over the phone, would *not* process a cancellation over

19   the phone right then and there, and would *not* put plaintiff through to a manager to do so. Later

20   that same day, plaintiff e-mailed Titanium, providing a report of the telephone call and attaching

21   copies of plaintiff's *two* prior cancellation notices and Titanium's *two* confirmations of

22   cancellation.

23       38.    On January 25, 2021 – more than a year after plaintiff's last communication with

24   Titanium – plaintiff received a letter dated January 22, 2021 on the letterhead of a company called

25   Credit Collection Bureau. The letter claimed it was from a debt collector and was an attempt to

26   collect a debt from plaintiff. It claimed that plaintiff owed Titanium at least **$3,488.93**. The letter

27   did not reference in any way the basis for the claimed debt and did not in any way reflect

28   plaintiff's prior actions relating to Titanium, including plaintiff's termination (twice) of any

relationship with Titanium, and Titanium's confirmation (twice) of plaintiff's termination. The letter specifically said that plaintiff could respond by calling Credit Collection Bureau.

39.     On January 25, 2021 – the very day plaintiff received the letter – plaintiff called the phone number provided in the letter. Calling that number rolled plaintiff into a recording from defendant United Legal Group, and then into voicemail where a message could be left.

40.     Having that phone number ring to a company called United Legal Group – as opposed to Credit Collection Bureau, the name of the company on the demand letter plaintiff received – is a deception perpetrated against consumers that is intended to make consumers think that they are now dealing with a law firm. That, in turn, is a ploy to increase the anxiety experienced by consumers, all for the purpose of exploiting and leveraging that anxiety to extract concessions from consumers. Moreover, the calling that phone number automatically connects the caller to a recorded message that again confirms that the company (United Legal and its alias Credit Collection Bureau) is attempting to collect a debt.

41.     Significantly, on plaintiff's first telephone call to United Legal on January 25, 2021, plaintiff left a voicemail, *clearly stating that he did not owe the debt, was contesting the debt and wanted a call back*.

42.     On January 26, 2021, having not heard back from United Legal, plaintiff called the same number again, rolled into voicemail again, and again left a message asking for a return call.

43.     On January 27, 2021, plaintiff received a call back that rolled into plaintiff's voicemail. The call and message was from Sean Brown of United Legal, and he said he had received plaintiff's voicemails and was returning plaintiff's calls.

44.     On January 27, 2021, plaintiff called back and spoke with United Legal's Sean Brown. As is the case at all times when a consumer calls the United Legal general phone line, a recording comes on before a person answers the call and informs the consumer that the phone call may be recorded and that "any information obtained will be used" to collect a debt. Once a person answers the call – as was done when Mr. Brown answered plaintiff's January 27 phone call – the United Legal representative provides an additional notice of the same points.

45.     During the January 27 telephone call, Mr. Brown identified that the debt was from

COMPLAINT, CASE NO. _____

1   Titanium and then he asked for plaintiff's position. Plaintiff informed Mr. Brown that he was an

2   attorney and asked if Mr. Brown was an attorney. Mr. Brown said he was not. Plaintiff then told

3   Mr. Brown that it makes a lot more sense to have plaintiff speak with a lawyer because that's

4   where this will end up anyway. Cutting out the "middle-man" telephone calls will save both

5   plaintiff and Mr. Brown time. Mr. Brown readily agreed with plaintiff's point and clearly

6   indicated that United Legal did have attorneys on staff for just this sort of matter. During the

7   January 27 call, plaintiff also asked Mr. Brown to confirm that no further action will be taken by

8   United Legal until after further discussions between plaintiff and a United Legal lawyer. Mr.

9   Brown understood exactly what plaintiff was saying and agreed with and fully confirmed the

10  point, saying that a "hold" has been placed on the account. Mr. Brown said plaintiff should expect

11  a call back from a United Legal lawyer within the next several days, though it could be delayed a

12  bit because the company offices were moving that week.

13          46.     On February 3, 2021, plaintiff received a call from a different United Legal

14  representative. Again, plaintiff was told the telephone call was being recorded. Incredibly, and

15  though plaintiff already had left two voicemails and had a telephone conference with Mr. Brown,

16  the representative who called on February 3 *had absolutely no idea of any of plaintiff's prior*

17  *dealings with United Legal* (the letter, the voicemails, the discussion with Mr. Brown, the

18  promise that plaintiff would receive a call from a lawyer at United Legal, the promise that the

19  account was on hold, etc.), and was not a lawyer. Rather, the United Legal representative was

20  proceeding as if none of that had happened, a sort of Groundhog Day scenario. Plaintiff again told

21  the United Legal representative that plaintiff did not owe the debt and that plaintiff needed to

22  speak with an attorney at United Legal.

23          47.     Incredibly, and in violation of the law, the United Legal representative said that if

24  the Titanium debt had been reported to him and he was now calling plaintiff, then that meant the

25  debt *was necessarily legitimate and owed*. The United Legal representative effectively said that

26  all debts that he works on are legitimate and are owed and the only question is whether and how

27  plaintiff will pay the debt. The United Legal representative said he had – and was looking at –

28  plaintiff's file and he had – and was looking at – the contract that purportedly supported that

COMPLAINT, CASE NO. _____

1  plaintiff owned the debt to Titanium. Plaintiff told the United Legal representative to make sure

2  to keep the tape recording of the February 3 telephone call.

3      48.    On February 4, 2021, plaintiff received a voicemail from another United Legal

4  representative named Ms. Delgado. It was very clear from the voicemail that Ms. Delgado had no

5  idea of any of the prior history between plaintiff and United Legal. Another Groundhog Day

6  scenario.

7      49.    On February 11, 2021, plaintiff received a call from yet a different United Legal

8  representative. The United Legal representative had no idea about any of the prior history,

9  including that plaintiff was supposed to receive a call from a lawyer or that the account was on

10  hold or that plaintiff had already had made it clear multiple times that he did not owe the debt and

11  was contesting the debt. Another Groundhog Day scenario. Like all United Legal calls, United

12  Legal announced that the call was being recorded.

13      50.    After plaintiff complained to the United Legal representative during the February

14  11 call, she put the call through to her manager. After plaintiff complained to the manager, he

15  eventually put Mark Hakim on the phone.

16      51.    During the February 11, 2021 telephone call with Mark Hakim, Mr. Hakim

17  referred to himself as Jacob and initially refused to provide his full name. When he eventually did

18  provide his full name, he said his name was Jacob King. That was a lie. As plaintiff discovered a

19  month later, Jacob King's real name was Mark Hakim.

20      52.    During the February 11 call, plaintiff told Mr. Hakim to keep all phone recordings.

21  Mr. Hakim said that United Legal only "may" record calls. That, too, was later shown to be a lie –

22  as confirmed by a different United Legal employee, United Legal records *all* calls with consumer-

23  debtors. In any event, during that call Mr. Hakim played a recording of the first voicemail

24  plaintiff left with United Legal on January 25. That recording absolutely, positively confirmed

25  that in the very first call to United Legal, plaintiff made abundantly clear that he was contesting

26  the debt.

27      53.    During the February 11 telephone call with Mr. Hakim, plaintiff asked for the

28  contract that purportedly supports the debt. Mr. Hakim indicated he'd send plaintiff the contract,

but never did. When plaintiff told Mr. Hakim that plaintiff was a lawyer and asked if Mr. Hakim was a lawyer, Mr. Hakim said he was not.

54.     Incredibly, and in a menacing and harassing tone, Mr. Hakim said that plaintiff was probably not a lawyer either, that plaintiff probably could not pass the bar exam, and – in an incredibly ironic statement – said that plaintiff was acting like a lawyer and threatening a lawsuit solely to get improper leverage.

55.     Incredibly, and in a menacing and harassing tone, and without asking if plaintiff possessed such records (plaintiff did), Mr. Hakin accused plaintiff of making up a story about terminating Titanium's services. Mr. Hakim said that if plaintiff was telling the truth surely plaintiff would have records supporting it and because plaintiff doesn't have such record it's clear plaintiff was lying. Mr. Hakim simply assumed that plaintiff did not have any records of terminating Titanium. During the February 11 call with Mr. Hakim, plaintiff forwarded to Mr. Hakim plaintiff's two cancellation e-mails and the two Titanium cancellation confirmations.

56.     By the conclusion of the February 11 telephone call, Mr. Hakim told plaintiff that plaintiff would *only be dealing with Mr. Hakim from there on out, and that Mr. Hakim would be solely responsible for United Legal's review and action on plaintiff's account.*

57.     On February 13, 2021, plaintiff e-mailed Mr. Hakim (who during this period was still pretending to be Jacob King) to remind him to keep all recordings of plaintiffs phone calls with and voicemails left with United Legal.

58.     On February 15, 2021, plaintiff e-mailed Mr. Hakim and demanded that United Legal preserve all relevant documents and asked which, if any, recordings of plaintiff's phone calls have already been destroyed.

59.     On March 3, 2021, an entirely different United Legal representative named Vanessa left a voicemail for plaintiff. It was quite clear that Vanessa had no idea of plaintiff's prior history with United Legal, including that plaintiff had already contested the debt, that the account was allegedly on hold, that plaintiff had already spoken with numerous United Legal representatives, and that that plaintiff was told he'd only be dealing with Mr. Hakim from February 11 forward. Yes, another Groundhog Day scenario.

COMPLAINT, CASE NO. _____

60.     On March 4, 2021, plaintiff received a call from yet another United Legal representative, Ms. Stephanie Rose. Incredibly, another Groundhog Day scenario. As always, United Legal and Ms. Rose made clear they were recording the call. Ms. Rose was entirely unaware of the numerous other calls/voicemails plaintiff had had with or from United Legal and the fact that plaintiff already communicated many times that he challenged the debt. Ms. Rose was also entirely unaware that plaintiff had spoken with Mr. Hakim, that the account was on hold, or that all future communications about the matter were to be with Mr. Hakim. Among other things, Ms. Rose also communicated the following:

        a.   She said the call "*is* being recorded." Not "may," but is.

        b.   Plaintiff told Ms. Rose what plaintiff had communicated to United Legal many times before, i.e., that it was very important that the recording be maintained as it is evidence that plaintiff wanted for his case against United Legal. Ms. Rose said that United Legal would never delete a recording. She said that the recordings are for the protection of United Legal and the consumer-debtor.

        c.   She advised plaintiff that she was calling to collect a debt on behalf of Titanium. She said the Titanium debt was now at **$4,445.82**, and that the debt dates back to March 2019.

        d.   Ms. Rose told plaintiff – and then in response to a direct question from plaintiff, confirmed to plaintiff – that the alleged Titanium debt *had been reported by United Legal to credit reporting agencies*.

        e.   Ms. Rose told plaintiff that his credit report was excellent (Ms. Rose made it seem that she was looking at plaintiff's credit report during the call) and then said that *she thought plaintiff certainly would want to clear-up this debt given how meticulously plaintiff keeps his credit*. In other words, Ms. Rose was clearly trying to improperly exploit and leverage a threatened blemish on plaintiff's credit report to get plaintiff to pay off the purported Titanium debt.

COMPLAINT, CASE NO. _____

61.     On March 4, 2021, plaintiff provided a written report to Mr. Hakim of plaintiff's March 4 call with Ms. Rose, and demanded a full explanation of any and all reports to credit reporting agencies, and demanded that all inquiries to plaintiff from United Legal immediately stop. Mr. Hakim responded that he wanted to discuss by phone. Plaintiff told Mr. Hakim that *all further communications were to be solely in writing*. Mr. Hakim claimed he could not honor plaintiff's request under the guise that he was not permitted to convey personal information by e-mail.

62.     On March 5, 2021, Mr. Hakim claimed that he was cancelling United Legal's account relating to plaintiff and Titanium, as if by doing so he could wash his hands of United Legal's unlawful conduct. He did not address Ms. Rose's statement about a report having already been made to credit reporting agencies – neither he nor United Legal have ever addressed Ms. Rose's statement – but, using carefully chosen words, indicated no report would be made *in the future*.

63.     On March 6, 2021, plaintiff e-mailed Mr. Hakim and demanded a full report about any reporting United Legal had made to credit reporting agencies.

64.     On March 6, 2021, Mr. Hakim e-mailed that all further communications by plaintiff should be with Titanium, because United Legal was closing its file – again acting as if, presto chango, United Legal could magically make its unlawful conduct disappear. Also again, Mr. Hakim provided no report or explanation as to Ms. Rose's statement that United Legal had already reported the purported Titanium debt to credit reporting agencies.

65.     On March 6, 2021, plaintiff again e-mailed Mr. Hakim to confirm that he is refusing to answer plaintiff's questions about United Legal's actions, including Ms. Rose's statement about reporting plaintiff to credit reporting agencies.

66.     On March 8, 2021, and despite plaintiff making it very clear that all further communications were to be solely in writing, Mr. Hakim called plaintiff. By that time plaintiff had figured out that Jacob King was not Mr. Hakim real name. When plaintiff confronted Mr. Hakim about that issue during the March 8 phone call, Mr. Hakim lied again, saying that Mark Hakim *is a different person than Jacob King* and that if plaintiff wanted to speak with Mr. Hakim,

COMPLAINT, CASE NO. _____

1    he (Mr. King) would have to go get him.

2          67.    Incredibly, and in a menacing and harassing manner, Mr. Hakim also told plaintiff

3    during the March 8 phone call that Mr. Hakim was going to report plaintiff to the state bar.

4    Plaintiff again demanded that Mr. Hakim honor plaintiff's request that all communication be in

5    writing.

6          68.    Incredibly, and in a menacing and harassing manner, Mr. Hakim said he would not

7    communicate with plaintiff only in writing. Plaintiff did everything he reasonably could to end

8    the March 8 phone call and finally accomplished that goal by simply hanging up. But, almost

9    immediately after plaintiff ended the phone call, Mr. Hakim called plaintiff back – *twice* on

10   plaintiff's cell phone and *three* times on plaintiff's work phone. Plaintiff did not answer any of

11   the calls.

12         69.    On March 8, 2021, Mr. Hakim sent plaintiff a rambling e-mail that, significantly,

13   included the admonition that "*This communication is from a debt collector in an attempt to*

14   *collect a debt*, and any information obtained will be used for that purpose."

15         70.    Incredibly, and in a menacing and harassing manner, in the March 8 e-mail Mr.

16   Hakim challenged the fact that plaintiff had been using plaintiff's work e-mail to communicate

17   with United Legal as if plaintiff was doing so as part of some sort of improper threat-scheme

18   because it is an e-mail from a law firm e-mail account.

19         71.    Incredibly, and in a menacing and harassing manner, in the March 8 e-mail Mr.

20   Hakim insinuated that plaintiff improperly threatens lawsuits.

21         72.    Incredibly, and in a menacing and harassing manner, in the March 8 e-mail Mr.

22   Hakim insinuated that plaintiff does not comply with the ethical obligations of an attorney.

23         73.    Incredibly, and in a menacing and harassing manner, in the March 8 e-mail Mr.

24   Hakim made a thinly-veiled threat to report plaintiff to plaintiff's law firm, saying that plaintiff's

25   law firm and firm chairman are pretty clearly not aware of plaintiff's actions and would not

26   "approve this practice of trying to make threats and bully people using the company's resources

27   for your own personal means."

28         74.    Incredibly, and in a menacing and harassing manner, in the March 8 e-mail Mr.

COMPLAINT, CASE NO. _____

1  Hakim insinuated that he and United Legal have been damaged by plaintiff's actions and that
2  plaintiff's law firm may also "be liable since [plaintiff is] using the[] [law firm] . . . resources as a
3  tool for these threats."

4  **FIRST CAUSE OF ACTION**

5  **(Violation of the Fair Debt Collection Practices Act**

6  **against Defendant ULRS, Inc. dba United Legal Group)**

7         75.     Plaintiff incorporates by reference all of the preceding paragraphs.

8         76.     United Legal's actions detailed above of misrepresentations, threats, false
9  reporting, refusing to communicate solely in writing, abusive language and tactics, unfair and
10  unconscionable tactics, harassment, attempting to collect a debt not owed, failure to verify a debt
11  after plaintiff disputed the debt, and failure to maintain systems reasonably adapted to avoid error
12  were done knowingly and willingly. United Legal's actions detailed above violate the FDCPA,
13  and have caused injury to plaintiff.

14  **SECOND CAUSE OF ACTION**

15  **(Violation of the Rosenthal Fair Debt Collection Practices Act**

16  **against Defendant ULRS, Inc. dba United Legal Group**)

17         77.     Plaintiff incorporates by reference all of the preceding paragraphs.

18         78.     United Legal's actions detailed above of misrepresentations, threats, false
19  reporting, refusing to communicate solely in writing, abusive language and tactics, unfair and
20  unconscionable tactics, harassment, attempting to collect a debt not owed, failure to verify a debt
21  after plaintiff disputed the debt, and failure to maintain systems reasonably adapted to avoid error
22  were done knowingly and willingly. United Legal's actions detailed above violate the RFDCPA
23  and have caused injury to plaintiff.

24  **THIRD CAUSE OF ACTION**

25  **(Violation of the Fair Credit Reporting Act**

26  **against Defendant ULRS, Inc. dba United Legal Group)**

27         79.     Plaintiff incorporates by reference all of the preceding paragraphs.

28         80.     United Legal's actions detailed above of misrepresentations, threats, false

**- 15 -**

1   reporting, failing to provide a full reporting of said false reporting, refusing to communicate

2   solely in writing, abusive language and tactics, unfair and unconscionable tactics, harassment,

3   attempting to collect a debt not owed, failure to verify a debt after plaintiff disputed the debt, and

4   failure to maintain systems reasonably adapted to avoid error were done knowingly and willingly.

5   United Legal's actions detailed above violate the FCRA and have caused injury to plaintiff.

6                                **FOURTH CAUSE OF ACTION**

7                    **(Violation of the California Consumer Credit Reporting Agencies Act**

8                        **against Defendant ULRS, Inc. dba United Legal Group)**

9           81.     Plaintiff incorporates by reference all of the preceding paragraphs.

10          82.     United Legal's actions detailed above of misrepresentations, threats, false

11   reporting, failing to provide a full reporting of said false reporting, refusing to communicate

12   solely in writing, abusive language and tactics, unfair and unconscionable tactics, harassment,

13   attempting to collect a debt not owed, failure to verify a debt after plaintiff disputed the debt, and

14   failure to maintain systems reasonably adapted to avoid error were done knowingly and willingly.

15   United Legal's actions detailed above violate the CRRAA and have caused injury to plaintiff.

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        COMPLAINT, CASE NO. _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIFTH CAUSE OF ACTION**

**(Declaratory Relief**

**against Defendant Titanium Alarms LLC)**

83.     Plaintiff incorporates by reference all of the preceding paragraphs.

84.     Defendant Titanium is wrongfully asserting that plaintiff is contractually obligated to pay it alarm monitoring fees and has hired debt collectors to try to collect the purported debt.

85.     A controversy exists between Titanium and plaintiff and plaintiff seeks a declaration that plaintiff is not indebted to Titanium.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against defendant **United Legal** as determined at trial and according to proof, and for the following remedies:

1.  For statutory and actual damages in an amount exceeding $25,000;

2.  For a permanent injunction requiring United Legal to withdraw any reports about plaintiff to any credit agencies and correct and cure all credit reports;

3.  For attorneys' fees and court costs, including via 15 U.S.C. § 1692k(a) and Cal. Civil Code § 1788.30(c); and

4.  For such other and further relief as the Court may deem just and proper.

Plaintiff prays for judgment against defendant **Titanium** as determined at trial and according to proof, and for the following remedies:

1.  A declaration that plaintiff owes Titanium nothing;

2.  For attorneys' fees and court costs; and

3.  For such other and further relief as the Court may deem just and proper.

Dated: May 10, 2021                          **MAYER BROWN LLP**
                                              Dale J. Giali
                                              Keri E. Borders

                                              By: _____
                                                     Dale J. Giali
                                              Attorneys for Plaintiff DALE J. GIALI

1

## DEMAND FOR JURY TRIAL

2

Plaintiff demands a trial by jury as to all causes of action for which such a right exists.

3

Dated: May 10, 2021

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MAYER BROWN LLP**
Dale J. Giali
Keri E. Borders

By: _____
Dale J. Giali
Attorneys for Plaintiff DALE J. GIALI

COMPLAINT, CASE NO. _____